**Dana L. Sullivan,** OSB No. 94483
E-mail: dana@baaslaw.com
**Alysa M. Castro**, OSB No. 163217
E-mail: alysa@baaslaw.com
BUCHANAN ANGELI ALTSCHUL
& SULLIVAN LLP
921 SW Washington St., Ste. 516
Portland, OR 97205
Telephone:  503.974.5015
Facsimile:  971.230.0337

    Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **DAVID JOSTAD,** | Civil No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | (Age Discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; Age Discrimination under ORS 659A.030; Failure to Pay Wages Due on Termination under ORS 652.140 and 652.150; Promissory Estoppel) |
| **MAY TRUCKING COMPANY, an Idaho corporation.** | |
| Defendant. | |
| | **DEMAND FOR A JURY TRIAL** |

## INTRODUCTION

1.    This is an action for declaratory, injunctive and monetary relief, including punitive damages and attorneys' fees and costs, to redress unlawful employment practices to which defendant subjected plaintiff, in violation of plaintiff's statutory and common law rights.

///

///

Page 1 – **COMPLAINT**

## JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

2.	Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, federal question jurisdiction.

3.	This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state claims arise from the same nucleus of operative facts as the federal claims. The state claims are so related to the federal claims that they form part of the same case or controversy and would ordinarily be expected to be tried in one judicial proceeding.

4.	Venue is appropriate in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

5.	Because a substantial part of the events or omissions giving rise to plaintiff's claims occurred within Marion and Deschutes counties, under LR 3-2(b), the Eugene Division of the United States District Court for the District of Oregon is the appropriate divisional venue.

6.	Plaintiff has exhausted his administrative remedies as to all claims for which administrative filing is a prerequisite by filing a complaint with the Equal Employment Opportunity Commission ("EEOC") on September 24, 2018 and permitting at least sixty days to pass prior to filing this lawsuit.

## PARTIES

7.	Plaintiff David Jostad ("plaintiff" or "Jostad") is currently a resident of Bend, Oregon. From May 1991 to July 2018, Jostad was an employee of defendant May Trucking Company.

8.	Defendant May Trucking Company ("defendant," "MTC, or the "Company") is an interstate motor carrier incorporated under the laws of the state of Idaho with its headquarters and principal place of business in Brooks, Oregon. At all material times, MTC employed more than twenty employees.

## GENERAL ALLEGATIONS

9.	C. Marvin May ("May"), MTC's owner and chief executive officer, hired Jostad to work for MTC on May 13, 1991 as the Company's Senior Vice President and General

Counsel.  Initially, Jostad reported directly to May.  After 2007, Jostad reported to both May and and MTC's President, David Daniels ("Daniels"), May's son-in-law.

10. Jostad served MTC extremely well during his twenty-seven years with the Company.  The Company awarded him merit-based pay increases and bonuses throughout his employment.

11. In or around 2007, Jostad's role with the Company changed.  Jostad became less involved in MTC's operational and day-to day legal matters and began working on business transactions and special projects for May and Daniels at their specific request.  As some of these projects involved the use of outside legal counsel, Jostad would often work on these projects in an advisory and/or managerial role, rather than in a legal capacity.

12. In or around March 2015, Jostad agreed to change his work location from Salem to Bend after MTC advised him that the Company was short on office space.

13. In June 2018, Jostad met May at May's home near Kalispell, Montana because May was considering purchasing a Flathead Lake island property and sought the benefit of Jostad's expertise regarding real estate transfers.

14. On June 22, 2018, May and Jostad picked up a new jet ski that May had purchased and then ate breakfast together before Jostad's flight back to Bend.  After picking up May's jet ski, May and Jostad went to breakfast at Wheat Montana Deli and Bakery in Kalispell, Montana.

15. During breakfast, May launched into a series of unusual questions about Mr. Jostad's age.  Specifically, May asked Jostad, "How old are you?  When is your birthday?  Are you on social security?  Are you on Medicare?"

16. Although Jostad was puzzled as to the purpose of May's seemingly random questions, Jostad responded that he was sixty-nine, and would be turning seventy in December 2018.  He replied that he had not yet applied to receive federal benefits except for Medicare Part A hospital coverage and explained that he paid the Company an employee premium for his family's health care benefits.

17. May then told Jostad, "We are letting you go." Jostad was stunned. He had no indication prior to this meeting that he was at risk of losing his job. Neither Daniels nor May had had any prior discussions with Jostad about his plans regarding retirement. In fact, May and Daniels had assured Jostad on multiple occasions that he could count on his job with MTC for as long as he wanted to continue working.

18. Nevertheless, May stated that he had discussed the matter with Daniels and they were in agreement to let Jostad go.

19. May instructed Jostad to take a week or so to wrap up what he was working on and prepare a list of all of his current tasks and client contacts. May added, "That should be easy because you don't work." Jostad was shocked, as neither May nor Daniels had ever questioned Jostad's work ethic or the quality of his work.

20. Jostad denied May's false accusation that he was not productive, stating "I work my butt off."

21. May responded with a litany of reasons why MTC was letting Jostad go. May first stated that Jostad could not keep working for MTC forever, was simply too old to continue working, and needed to retire. May then suggested that Jostad should be on social security instead of continuing to work, and pointed out that, when Jostad turned seventy in December 2018, his social security benefits would be at their maximum.

22. May also professed that MTC could not afford to keep Jostad and his family on the Company's self-insured health plan. May referenced the fact that Jostad had battled with cancer, as well as the fact that Jostad's wife suffers from a serious medical condition, and that Jostad has a dependent son with special needs. May asserted that health insurance coverage for Jostad and his family was costing the Company too much money.

23. During this conversation, May repeatedly noted that the Company was not eliminating Jostad's position. Rather, May explained that MTC needed two attorneys but, because Jostad was too old to continue working and was costing the Company too much money, MTC's intention was to replace Jostad with someone younger and less expensive.

Page 4 – **COMPLAINT**

24. May went on to say, "Look at me. I'm mostly retired. You need to retire. You can't just keep working. We need someone younger."

25. Jostad was stunned that May fired him so abruptly. Jostad had planned to continue working for MTC for another four years and was deeply troubled about the impact that his sudden termination would have on his and his family's financial plans.

26. Jostad was also personally hurt and devastated to be ousted in such a callous manner after working closely with May and Daniels for so many years and developing such a close working relationship them.

27. Before Jostad had a chance to process and respond to his abrupt termination, May indicated that he was concluding their discussion and that he would take Jostad to the airport.

28. Jostad and May sat in awkward silence as May drove Jostad to the airport. On the way there, May stopped at two stores to run some personal errands without asking Jostad or notifying him ahead of time, forcing Jostad to stand by and wait while May picked out gardening supplies and boating equipment.

29. May then unceremoniously dropped Jostad off at the airport approximately four hours before his flight to Portland.

30. The next day, on June 23, 2018, May emailed Jostad and asked him to review a contract. Jostad sent May a brief email in response, summarizing his conclusions.

31. Other than the brief email exchange on June 23, 2018, Jostad had no contact with May or Daniels regarding MTC's decision to terminate him until July 5, 2018, which was unusual, as May, Daniels, and Jostad generally spoke, emailed, and/or texted regularly.

32. On July 5, 2018, Jostad traveled to Salem with the intent of meeting with May or Daniels to return his company property and discuss how to smoothly transition his responsibilities. After discovering that neither May nor Daniels was in the office that day, Jostad spoke with Scott Smith ("Smith"), MTC's Vice President of Human Resources.

33. Jostad informed Smith that May had terminated his employment. Jostad also shared with Smith that, at the time of his termination, May attributed his decision to Jostad's age

and made numerous inappropriate or unlawful comments about Jostad's age, health, and eligibility to retire. Jostad returned to Smith his work laptop computer, printer, cell phone, car, credit cards, keys, and other Company-owned items and left the office.

34. Daniels called Jostad in the afternoon of July 5, 2018, after Jostad had left MTC's offices. Daniels swore "on a stack of bibles" that he was unaware of May's plan to fire Jostad.

35. Jostad relayed to Daniels what May said to him during their breakfast on June 22, 2018.

36. While Daniels continued to deny having any knowledge that May had fired Jostad, at no point during this phone call did Daniels challenge Jostad's characterization of Jostad's separation as an involuntary termination.

37. The next day, on July 6, 2018, May sent Jostad a text message, in which he professed to be shocked to learn that Jostad had returned his company property. May stated, in part,

> I have no idea how you got [that I was firing you] out of our short conversation about how we were both getting older and you were turning 70 in December. I thought you would want to retire or slow down at some point. We discussed how you would not be ready to retire as you needed to keep KIM on our insurance policy. We further discussed that this could be done by you working part time for us when retirement time came and we could have further conversations on what is best for you.

38. May also attempted to falsely characterize Jostad's termination as a resignation by texting, "I can't believe after these many years you would elect to leave our employment relationship without calling me."

39. Jostad noted that this text was more lengthy and verbose than was typical, causing Jostad to question whether it had been contrived and specifically crafted to avoid liability for May's statements during their June 22, 2018 meeting.

40. Notably, May's text did not suggest that he was willing to clear up the purported misunderstanding or confusion regarding their previous conversation, nor did May's text suggest

Page 6 – **COMPLAINT**

that Jostad should return to work. Rather, May's text expressed a tone of finality, stating "I want want you to know how important you have been to me."

41. A few days later, on Monday, July 9, 2018, Daniels called Jostad and told him that he was in a bind as a result of May's conduct and expressed frustration with May's tendency to interfere with his duties as the Company's president. At no point during this phone call did Daniels dispute that May had fired Jostad over breakfast on June 22, 2018.

42. Daniels indicated that he did not want to send Jostad a termination letter and was hopeful that they could resolve the matter and continue doing business. Daniels suggested that Jostad participate in a meeting at May's ranch in Sisters, Oregon, so that Daniels could mediate a discussion between May and Jostad in an effort to resolve their dispute. Jostad responded that he was unwilling to do this, as the terms of the proposed meeting struck Jostad as skewed in favor of the Company's interests.

43. In lieu of this proposed "mediation," Jostad scheduled an in-person meeting with Daniels on July 13, 2018 in Salem to discuss how to best resolve the matter.

44. On July 12, 2018, Jostad received his final paycheck, which was delivered to his home by UPS and was left on his front porch.

45. On Friday, July 13, 2018, Jostad and Daniels met at the Original Pancake House in Salem.

46. During this meeting, Daniels took the position, for the first time, that Jostad had misinterpreted what May said on June 22, 2018. Jostad denied this, and explained that he had a very clear memory of what May said and that May was clear as to the reasons for Jostad's termination.

47. Daniels went on to explain that everyone was upset that Jostad had quit. Jostad was shocked, as Daniels had never before questioned the fact that May fired Jostad in any of their previous conversations.

///

Page 7 – **COMPLAINT**

48.     Jostad assured Daniels that he did not quit; he was fired by May. Jostad again explained that May specifically told him he was being let go because he was too old to keep working and because the Company needed someone younger and less expensive.

49.     As if nothing happened, Daniels asked Jostad to come back to work. However, Daniels's offer was contingent on Jostad signing a release of all claims against MTC, which Jostad was unwilling to do without some sort of written assurance of job protection.

50.     Daniels then asked Jostad what it would take (i.e. money or an employment contract) to get Jostad to come back to work. Daniels requested that Jostad provide him with a proposal and agreed to meet with Jostad the following week to discuss the proposal.

51.     Due to Daniels's travel schedule, Daniels and Jostad did not meet again until July 23, 2018, when they reconvened at the Original Pancake House in Salem. As per Daniels's request, Jostad laid out his settlement proposal.

52.     In order to ensure a smooth successor transition, Jostad indicated that he would agree to return to work at the same rate of pay and with the same benefits through August 2019, at which time MTC would pay Jostad a lump sum of $485,000. Jostad explained that he had planned to continue working for MTC for another four years. Jostad's proposal of a lump sum payment was the equivalent of three years of salary, bonus, and benefits which, in addition to the year of continued employment, would place him in the position where he expected to be upon his retirement.

53.     Later that evening, Daniels called Jostad and tersely informed him that he could not accept Jostad's proposed terms. Without conveying a counteroffer or alternative proposal and without further discussion, Daniels informed Jostad that he would direct Smith to tie up any loose ends and finalize Jostad's termination from MTC.

54.     The next day, July 24, 2018, Smith sent Jostad a termination letter. Smith's letter stated that he had conferred with Daniels and May, both of whom denied having "any knowledge" of Jostad's claim that he was terminated. Smith went on to state, "as you have returned all company property in your possession . . . without further contact from you I must

Page 8 – **COMPLAINT**

accept this as resignation of your employment." The letter indicated that MTC considered July 6, 2018 to be Jostad's last day of employment.

55. To Jostad's dismay, MTC then issued a lump sum payment for his non-qualified deferred compensation, instead of providing Jostad with three annual payments. This is contrary to the written confirmation Smith sent to Jostad in 2016 that Jostad had elected a three-year payout, rather than a lump sum. Jostad relied on Smith's false representation to his detriment, incurring significant adverse tax consequences, as well as a permanent reduction in his social security benefits.

56. When Jostad notified MTC of his potential claims against the Company, MTC responded by threatening to assert multiple unfounded counterclaims against Jostad in an effort to deter or dissuade him from filing a lawsuit against MTC or otherwise proceeding with his claims.

**FIRST CLAIM FOR RELIEF**
**Violation of 29 U.S.C. § 621 *et seq*.**
**Age Discrimination**

57. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 56.

58. At all material times, defendant employed twenty or more employees, including plaintiff, and was thus subject to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

59. Defendant discriminated against plaintiff by unlawfully terminating him because of his age.

60. Plaintiff is entitled to all appropriate injunctive relief and other equitable relief that may be appropriate, including but not limited to reinstatement.

61. As a direct and proximate result of defendant's actions as alleged herein, plaintiff has suffered economic losses in the form of back pay, lost benefits, and out-of-pocket expenses, plus prejudgment interest, in an amount to be proven at trial, but presently estimated to be

$85,200.  Plaintiff's lost wages and bonuses are continuing to accrue at a rate to be proven at trial but not less than $11,400 per month.  Plaintiff's lost benefits, including but not limited to health insurance, company car, company phone, retirement contributions, and lost social security benefits, are continuing to accrue at a rate to be proven at trial but not less than $1,600 per month.

62.     Because of financial pressures resulting from his sudden termination, plaintiff elected to receive social security benefits for 2018.  By drawing on his social security benefits at the age of sixty-nine, rather than seventy, plaintiff's benefits will be reduced by an amount to be proven at trial, but no less than $600 per month for the remainder of his lifetime.  Plaintiff is entitled to additional economic damages in the form of lost social security benefits.

63.     Plaintiff seeks an additional award of economic damages to compensate him for the additional tax liability for which he will be responsible if awarded a lump sum that will be paid in a single tax year for wages and benefits that would have otherwise been earned over the remainder of his career.

64.     Defendant's discriminatory conduct was intentional and/or in reckless disregard for plaintiff's rights under the law and therefore constitute willfulness for the purposes of the ADEA.  Plaintiff, therefore, is entitled to an award of liquidated damages equal to the amount of economic damages claimed.

65.     Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 626(b).

### SECOND CLAIM FOR RELIEF
### Violation of ORS 659A.030
### Age Discrimination

66.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 65.

67.     Defendant discriminated against plaintiff by unlawfully terminating him because of his age.

68.     Plaintiff is entitled to all appropriate injunctive relief and other equitable relief that may be appropriate, including but not limited to reinstatement.

69.     As a direct and proximate result of defendant's actions as alleged herein, plaintiff has suffered economic losses in the form of back pay, lost benefits, and out-of-pocket expenses, plus prejudgment interest, in an amount to be proven at trial, but presently estimated to be $85,200.  Plaintiff's lost wages and bonuses are continuing to accrue at a rate to be proven at trial but not less than $11,400 per month.  Plaintiff's lost benefits, including but not limited to health insurance, company car, company phone, retirement contributions, and lost social security benefits, are continuing to accrue at a rate to be proven at trial but not less than $1,600 per month.

70.     Because of financial pressures resulting from his sudden termination, plaintiff elected to receive social security benefits for 2018.  By drawing on his social security benefits at the age of sixty-nine, rather than seventy, plaintiff's benefits will be reduced by approximately $600 per month for the remainder of his lifetime.  Plaintiff is entitled to additional economic damages in the form of lost social security benefits.

71.     Plaintiff seeks an additional award of economic damages to compensate him for the additional tax liability for which he will be responsible if awarded a lump sum that will be paid in a single tax year for wages and benefits that would have otherwise been earned over the remainder of his career.

72.     As a direct and proximate result of defendant's actions as alleged herein, plaintiff has suffered noneconomic harm in the form of embarrassment, anxiety, humiliation, anger, emotional distress, inconvenience, damage to his professional reputation, and loss of enjoyment of life and is entitled to an award of compensatory damages in an amount of $500,000.

73.     The actions of defendant as alleged herein were intentional, willful, and with reckless disregard to plaintiff's rights.  Such conduct exceeds the bounds of social toleration and therefore plaintiff seeks to recover punitive damages for these actions in the amount of $500,000.

74. Plaintiff has hired legal counsel to prosecute his claims and is entitled to his reasonable attorneys' fees and costs incurred, including expert witness fees, pursuant to ORS 659A.885 and ORS 20.107.

## THIRD CLAIM FOR RELIEF
### Violation of ORS 652.140 and 652.150
### Failure to Pay Final Wages upon Termination

75. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 74.

76. Defendant willfully failed to pay plaintiff his final wages in a timely manner in violation of ORS 652.140.

77. Defendant treated July 6, 2018 as the effective date of plaintiff's employment separation, therefore defendant was obligated to pay all wages and compensation due to plaintiff by the end of the day on July 9, 2018.

78. In the alternative, if a fact-finder determines that plaintiff resigned on July 5, 2018, defendant was obligated to pay all wages due plaintiff by the end of the day on July 10, 2018.

79. Plaintiff did not receive his final paycheck until July 12, 2018.

80. As a result of defendant's willful failure to timely pay plaintiff all compensation due to him as required by ORS 652.140 on the date that it was due, plaintiff is entitled to penalty wags arising out of the final pay violation under ORS 652.150(1), in an amount to be proven at trial but not less than $2,533.44.

81. Plaintiff is entitled to prejudgment interest on the amount of the unpaid wages and penalty wages from the date the wages became due and owing.

82. Plaintiff has had to hire legal counsel to prosecute her claims and is entitled to reasonable attorneys' fees and costs incurred pursuant to ORS 652.200 and ORS 20.107.

///

///

## FOURTH CLAIM FOR RELIEF
### Promissory Estoppel

83. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 82.

84. During his employment with defendant, plaintiff participated in a non-qualified deferred compensation plan. Under this plan, plaintiff had the option of receiving a lump sum payment or payment in annual installments for a term not to exceed 15 years.

85. In or around September 2016, plaintiff sought confirmation from Smith that he had elected a three-year annual payout option related to his benefits under the Company's non-qualified deferred compensation plan ("the Plan"). Plaintiff recalled that this was his original election and did not recall revising that election, nor did he have paperwork reflecting that he had revised his original election.

86. In an email dated September 20, 2016, Smith represented that plaintiff had elected a three-year annual payout option and enclosed the agreement adopting the Plan, as well as the initial salary deferral agreement plaintiff signed in 2003, in which plaintiff opted to receive payment in annual installments over a three-year period.

87. Unbeknownst to plaintiff this representation was false. Smith failed to share with plaintiff documentation from 2005 reflecting that plaintiff had opted to receive a lump-sum payment, rather than annual payments.

88. After defendant fired plaintiff, defendant issued a lump sum payment for plaintiff's non-qualified deferred compensation, contrary to the written confirmation defendant provided to plaintiff, which indicated that he had elected a three-year annual payout.

89. MTC knew as of September 2016 that plaintiff desired and intended to elect a three-year annual payout instead of a lump-sum payment. MTC therefore knew or should have reasonably expected that its representation and assurances to plaintiff that his current written agreements reflected his desire to receive a three-year annual payout would induce plaintiff to forgo taking affirmative steps to change his payout election.

90. Plaintiff in fact relied on MTC's representation in 2016 that he had previously elected a three-year annual payout, rather than a lump sum, and did not make any changes to his payout options after MTC made this representation. In addition, in reliance on MTC's representation that his deferred compensation would be paid out in three annual installments, plaintiff elected to receive social security benefits for the entire 2018 year. By drawing on his benefits at the age of sixty-nine, rather than seventy, plaintiff's benefits will be reduced by approximately $600 per month throughout the remainder of his lifetime.

91. Because plaintiff received a lump-sum payment, rather than a three-year annual payout, plaintiff will suffer significant adverse tax consequences, as well as a reduction in his social security benefits for the remainder of his life.

92. Therefore, plaintiff is entitled to consequential damages caused by MTC's representation, which he relied on to his detriment, to compensate him for the adverse tax consequences and reduced social security compensation, in an amount to be proven at trial.

93. Plaintiff has had to hire legal counsel to prosecute her claims and is entitled to reasonable attorneys' fees and costs incurred pursuant to ORS 20.190

WHEREFORE, plaintiff prays for judgment against defendant as follows:

1. All appropriate injunctive relief, including but not limited to comparable reinstatement;
2. An award of economic damages for past and future lost wages and benefits and out of pocket expenses, plus prejudgment interest, in an amount to be determined at trial but presently estimated to be $85,200 and continuing to accrue;
3. An additional award of economic damages for plaintiff's lost social security benefits;
4. An additional award of economic damages to compensate him for the additional tax liability for which he will be responsible if awarded a lump sum that will be paid in a single tax year;
5. An award of noneconomic damages in an amount of $500,000.

Page 14 – **COMPLAINT**

6. An award of liquidated damages equal to the amount of economic damages claimed for plaintiff's claims under 29 U.S.C. § 621 *et seq.*;

7. An award of punitive damages against defendant in the amount of $500,000 for plaintiff's claims under ORS 659A.030;

8. An award of statutory penalty wages pursuant to ORS 652.150 in an amount to be proven at trial, but not less than $2,533.44;

9. An award of consequential damages to compensate plaintiff for the adverse tax consequences of receiving his deferred compensation payout in a lump sum and for his reduced social security compensation;

10. An award of prejudgment interest on the amount of the unpaid wages and penalty wages due plaintiff, from the date the wages became due and owing;

11. Plaintiff's attorneys' fees and costs incurred; and

12. Any further or alternative relief in favor of plaintiff that the Court deems appropriate.

13. Plaintiff demands a jury trial.

DATED this 8th day of January, 2019.

BUCHANAN ANGELI ALTSCHUL
& SULLIVAN LLP

s/ Dana Sullivan

**Dana L. Sullivan,** OSB No. 94483
E-mail: dana@baaslaw.com
**Alysa M. Castro**, OSB No. 163217
E-mail: alysa@baaslaw.com
Telephone: (503) 974-5015
*Attorneys for Plaintiff*